Filed 5/4/16  P. v. Miles CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>CHRISTOPHER COLVIN MILES,<br><br>        Defendant and Appellant. | A140226<br><br>(Alameda County<br>Super. Ct. No. 165422) |

Defendant Christopher Miles shot and killed Danny Jackson by firing a rifle from inside his house through a locked security screen door.  The shooting was linked to an abusive relationship involving two completely different people:  a woman named C.H. and one of her former boyfriends, Melvin Jones.  On the night of the shooting, C.H. was staying with Miles as a house guest.  Jones called on C.H. and aggressively pressed her to come outside to talk with him.  She refused.  Later, Jackson, an acquaintance of both Jones and C.H., continued to press C.H. to come outside and talk with Jones.  Jackson became increasingly belligerent, and Miles then shot him from behind the security door.

Miles was charged with murder, but his conviction was far from inevitable.  Even though Jackson was unarmed and outside the security door when he was shot, the shooting could be viewed as an attempt by Miles to protect an abuse victim whom he had invited to stay in his home and who, in the words of his appellate counsel, "was taking refuge there."  The first trial resulted in a hung jury.  Miles then reached a plea agreement under which, in front of one judge, he pleaded no contest to voluntary manslaughter and admitted a firearm enhancement in exchange for a six-year prison term.  But a different

1

judge later refused to impose that sentence, apparently being disinclined to accept anything less than a nine-year prison term. Miles filed a petition for a writ of mandate/prohibition in this court seeking an order requiring him to be sentenced by the judge who had taken the plea, but the petition was denied. Miles then withdrew his plea, and a second trial was held.

This time, the jury convicted Miles of one count of second degree murder and found true an allegation that he personally and intentionally discharged a firearm causing death.[1] He was sentenced to 40 years to life in prison, composed of the statutorily required terms of 15 years to life for the murder and 25 years to life for the firearm enhancement. (§§ 190, subd. (a), 12022.53, subd. (d).) This appeal followed.

On appeal, Miles argues that (1) the trial court effectively forced him to testify in violation of his Fifth Amendment rights by refusing, after the defense initially rested, to give jury instructions on principles related to self-defense and on voluntary manslaughter based on a sudden quarrel or heat of passion (heat-of-passion voluntary manslaughter); (2) the court improperly denied his request for pinpoint instructions on the relevance of Jones's prior threatening conduct; (3) the prosecutor committed misconduct in closing argument by suggesting, in contravention of *People v. Beltran* (2013) 56 Cal.4th 935, that Miles did not commit heat-of-passion voluntary manslaughter because Jackson's conduct was insufficiently provocative to cause a reasonable person to kill; (4) cumulative error requires reversal; and (5) an error in the abstract of judgment requires modification.[2] We agree that the abstract of judgment must be corrected, but we otherwise affirm.

---

[1] Miles was convicted of murder under Penal Code section 187, subdivision (a), and the personal-discharge allegation was found true under Penal Code section 12022.53, subdivision (d). All further statutory references are to the Penal Code unless otherwise noted.

[2] We need not reach Miles's claim that his trial counsel rendered ineffective assistance by failing to object to the prosecutor's comments because we consider the prosecutorial-misconduct claim on the merits.

# I.
## FACTUAL AND PROCEDURAL
### BACKGROUND

In April 2010, Miles was 57 years old and lived by himself on 79th Avenue in Oakland, near the intersection with International Boulevard. The property included a front house facing the street and a rear cottage, in which Miles had lived for almost 20 years. The cottage was reached by a long driveway running along the right side of the property as viewed from the street.

          1.      The evidence introduced before Miles testified.

C.H. was the prosecution's primary witness. She testified that she was friends with Miles, whom she described as "a good friend, confidante, like a big brother." She testified that she had dated Jones for about four months but had broken up with him sometime around late March 2010 because he was physically abusive. After she moved out of Jones's home, Jackson invited her to stay with him. C.H. had once been involved in a three-year relationship with Jackson, and although the relationship ended in November 2009, she was still on good terms with him and he "protected [her] . . . from [Jones], often."

After C.H. left Jones, "he started stalking [her] everywhere [she] would go." She testified that on April 8, 2010, Jones saw her while she was walking down the street, "tried to snatch [her]," and hit her in the face, cutting her nose and lip. A few days later, the apartment where she was staying with Jackson caught fire. C.H. testified that she had seen Jones looking around the apartment building earlier that day, and although she did not actually see him set the fire, she "kn[e]w" he had done so because "he was the type of person that would do something like that . . . to get [her] to come out and leave [Jackson] to be with him." She was "absolutely scared to death of [Jones], 'cause he was very abusive. He was just a lunatic."

Jackson lived across the street from Miles. The two men were not close friends, but they knew each other, and C.H. was not "aware of any bad blood or previous

3

disagreements between [them]." After the fire at Jackson's apartment, Miles invited C.H. to stay in his home.

C.H. stayed with Miles the night of April 11. The next day, she was still there when he arrived home from work sometime after 5:00 p.m. After eating dinner, she watched television in the bedroom. The bedroom was at the front of the cottage and had a window to the right of the front door as one faced the cottage. Miles remained in the living room, into which the front door opened.

At some point, C.H. heard Jones knock on the front door and ask Miles if she was there. C.H. had told Miles about her relationship with Jones, and she heard the two men begin to argue after Miles told Jones that C.H. did not want to see him. She heard Jones "screaming and hollering, calling [her] all kinds of names, calling [Miles] all kinds of names," threatening to " 'hurt her' " if she did not come outside, and threatening Miles. Miles did not "raise his voice very much" but repeatedly told Jones to leave. C.H. testified that she and Miles were both "scared."

About five minutes after the argument began, Jones broke the bedroom window. C.H., who was still in that room, could not see what broke the window because the curtain was closed, but she saw glass fall onto the floor.[3] She heard Jones "going out the driveway and . . . talking crazy," followed by a gunshot. Miles then entered the bedroom, said, " 'I missed him,' " "cover[ed] the window so . . . nothing else could come in," and cleaned up the glass. C.H. believed Miles had fired the shot but did not ask him about it because she "was scared of everything that was going on, the conversations that [she] was hearing, the gunshot, the arguments, just fearing for [her] whole life."

After Miles finished covering the window, he returned to the living room and C.H. stayed in the bedroom. She testified that things were quiet and that she and Miles "thought everything was over," although she was afraid that Jones might still be nearby. About 30 to 45 minutes later, however, Jackson knocked on the door and asked to speak

---

[3] What Jones may have used to break the window was never established. A screwdriver was later discovered on the floor near the window, but Miles testified that he had dropped it there at least a day earlier.

to C.H.  She testified that she wanted to talk to him because she suspected that he had told Jones where she was.

Miles let Jackson in, and Jackson went into the bedroom to talk to C.H.  Jackson did not appear to be carrying any weapons.  He told C.H., " '[Jones], he just came over here, and he said [Miles] wouldn't let him talk to you.  So, he asked me to come and see if I could talk to you and get you to come outside and talk to him.' "  C.H. was angry that Jackson was acting "on behalf of . . . Jones," and she told Jackson that she would not talk to Jones.  After about five minutes, Miles, who was standing behind Jackson and had listened to the conversation, told Jackson that C.H. was not coming.  Miles then escorted Jackson outside.

Miles's cottage had a front porch, and the front doorway had both a lockable metal security screen door and an inner wooden door.  C.H. testified that as soon as Jackson was outside, she "heard him banging on the [screen] door," which Miles had locked, saying, " 'Man, you wrong.  [C.H.], you come out, you need to come out, because I ain't gonna let nothing happen to you.  Just talk to him, just talk to him.' "  Although she could not see the two men, she could hear Miles telling Jackson that she was not going to come out and he needed to leave.  Jackson was "throwing things up against the door, trying to open [it], . . . shaking at [it], banging, just acting really like he was out of his mind."  It sounded to her like Jackson was "trying to break in."

Jackson was not usually so "aggressive and violent," and C.H. believed he was under the influence of drugs.  Although she characterized Jackson's behavior as "threatening," she could not recall whether Jackson made any specific threats against her or Miles.  She initially testified that she "never feared [Jackson]," but she later said that his banging on the door scared her.  She also agreed that she was "afraid [she] could be killed that night," but she did not specify whom she perceived as a deadly threat.

C.H. then heard a gunshot.  Miles came into the bedroom and said, " 'I shot at him, I think I hit him.' "  He told C.H. that he had called the police and that she should leave to avoid being involved.  She quickly gathered her things and left the house within five minutes.  On her way out, she saw a gun in the living room.

5

Outside, C.H. saw Jackson sitting against the side of the front house with his legs extending across the driveway. It was very dark, but she did not see any weapons near him. She heard him say in a "really muffled" voice "[e]ither I was shot, I'm shot, or the nigger shot me." Although she did not see anyone else, she was afraid that Jones might be nearby, based on Jackson's pleas for her to come outside to talk to Jones.

That night, B.R. was sleeping in her mother's house, which was next door to Miles's cottage on the driveway side. B.R. testified that she was awakened by "somebody banging on [Miles's] door and yelling" for someone whose name sounded like "Karen" to come outside and talk. She testified that she did not recognize the man's voice, but, as time went on, it became "angrier" and "more aggressive." She then heard the voice say, " 'You know you shouldn't be in there, that's wrong. You're my brother's wife. You got no business fucking this guy.' " She also heard another male voice that could have been Miles's, but it was so soft that she could not hear any words.

B.R. testified that things were quiet for about 10 minutes until "the yelling, the comments[,] and all that stuff started up again" between what sounded like the same two people. The renewed noise prompted her to get up and look out the window, toward Miles's cottage. She saw "a tall gentleman standing in front of" a "shorter" man, who she believed was wearing a cap.[4] The men were on either side of an entryway—formed by the front house's back wall and a brick wall, no more than a few feet tall, perpendicular to the back wall—onto the small courtyard between the front house and cottage.

As B.R. watched, the argument "escalat[ed]," and she heard the tall man with the louder voice say, " 'I can get a gun, too. That ain't no big thing.' " She interpreted this statement as a threat, but she did not ever hear "the taller man make a threat of imminent harm to the smaller man." The two men "went talking on about guns," and then the tall man said, " 'I'm not afraid' " and, about five to ten times, " 'Shoot me, motherfucker, shoot me.' " B.R. did not, however, see a gun at any time during the incident.

---

[4] Testimony was presented that Miles was five feet, six inches tall, Jackson was about five feet, eight inches tall, and Jones was about six feet, two inches tall.

B.R. then heard a shot and turned to see the tall man on the ground, with the shorter man, whom she assumed was Miles but whose face she could not actually see, "[r]ight in front of him . . . in the entryway." The tall man repeated, " 'Motherfucker shot me, motherfucker shot me.' " No more than a minute later, B.R. heard another gunshot.[5] She also heard a voice she recognized as Miles's say, " 'I shot him. Call 911.' " She left the window and called 911 to report the shooting.

The police arrived a few minutes later, around 10:35 p.m. One of the responding officers testified that Jackson was lying on the ground "and there was blood pooling around his body and head." A baseball cap was on the ground near his head. The police announced their presence, and Miles appeared in the cottage's doorway with his hands up. He did not seem to be injured or to have engaged in a physical struggle. After the police detained him and he was asked what had happened, he responded, " 'I did it' " and indicated that the gun he had used was inside the cottage. A rifle was recovered from the bedroom, but no weapons were found in the driveway or anywhere on or near Jackson's body.

Miles's metal security screen door had what appeared to be three bullet holes in it, made by shots fired from inside the cottage: one at less than eighteen inches above the porch, one at three feet, eleven inches above the porch, and one at four feet, six inches above the porch. The window in the room where C.H. had been was broken, and the "heavy mesh" screen covering it was torn. The window appeared to have been broken from the outside, based on the fact there was glass on the windowsill and carpet but none outside. A headboard and "a shutter-style louvered door" were leaning against the window.

An expert in firearms and ballistics testified that the weapon used to kill Jackson was a normally functioning Lee-Enfield bolt-action rifle designed for the British military,

---

[5] Three other neighbors also heard two gunshots. One testified that the gunshots were thirty seconds to a minute apart, one testified that they were between five and fifteen seconds apart, and the third, who testified for the defense, said they were no more than four or five seconds apart.

which used it primarily during the first half of the twentieth century.  To operate the rifle, the user would have to insert cartridges into a magazine, insert the magazine into the rifle, pull back on the bolt to load a cartridge into the chamber, push the bolt forward, lock it into a safe firing position, and pull the trigger.  To chamber a new round after firing the rifle, the user would have to unlock the bolt and then pull it back, ejecting the expended cartridge case and feeding a new cartridge into place, slide the bolt forward, and lock it.  The expert testified that it would be possible "to fire this weapon and reload it to fire again" in four to five seconds or even less, if one was "highly proficient" in the weapon's use.

Jackson died of multiple gunshot wounds.  A forensic pathologist testified that Jackson had been shot in the right hip and cheek.  The bullet that entered Jackson's hip traveled slightly downward and toward the left, front side of the body, severed the right femoral artery, and exited his groin.  This wound would have likely caused death within three to five minutes.  The bullet that entered Jackson's cheek broke his jaw and traveled downward and to the left, toward his feet.  It was possible a person would still be able to speak after sustaining such a wound.  The pathologist testified that the physical evidence was consistent with Jackson's "being shot first in the hip and falling down and then turning . . . [and] being shot the second time in the face" but could not definitively say which shot was fired first.  A toxicology report indicated the presence of alcohol and cocaine in moderate amounts in Jackson's blood.

2.       Miles's testimony and police interview.

The defense initially rested after presenting testimony from only one witness, the neighbor who believed only four or five seconds passed between the two gunshots she heard.  But after the trial court ruled that it would not instruct the jury on various self-defense-related principles or heat-of-passion voluntary manslaughter, Miles was allowed to reopen his case, and he testified.  The prosecution then presented a rebuttal witness, a police lieutenant who interviewed Miles a few hours after the shooting, and a short excerpt of a video recording of that interview was played for the jury.

Miles testified that he arrived home from work around 8:00 p.m. on the night of the killing. C.H., who had told him that "somebody was stalking her" and "had beat[en] her and . . . set her place on fire," was staying with him. He and C.H. smoked a $10 piece of crack cocaine, "a very small amount" whose effects dissipated within half an hour.[6]

Miles testified that he and C.H. heard "loud banging" on the front door and a window sometime around 9:30 p.m. When Miles opened the interior wooden door, he saw a man he did not know but later identified as Jones, who "was hollering and waving his hands, saying, 'I want to see . . . my girlfriend [C.H.]' " C.H. denied that Jones was her boyfriend, and Miles told Jones to leave the property.

As Miles was walking away after closing the wooden door, he heard glass break in the bedroom. He then picked up the rifle, which he testified he had found loaded, along with two boxes of ammunition, under a trailer in his yard a few weeks earlier, and which he had never shot before. Jones ran around the back of the house, and Miles could "hear him rumbling back there" but could not tell what he was doing.

Miles moved back toward the doorway and, holding the rifle at an angle slightly down and to the left toward B.R.'s mother's house, shot once through the security screen door. Miles testified that he was "not aiming at [Jones]," who was out of sight, "but . . . just fired" in an attempt to "scare him off." Miles explained that he shot through the security door instead of opening it because he was not sure whether Jones was armed and did not want to go outside. Jones ran away down the driveway, and Miles placed the rifle against the wall.

Miles estimated that Jackson then arrived within seconds after Jones left. Miles testified that he believed Jackson "had to [have been] out in front of [Miles's] house the whole time that [Jones] came down [the] driveway. They were together." Miles claimed that Jackson said, referring to Jones, " 'The guy's gone down to call his boys. He said he's gonna come back and do something to you.' " Miles testified that he felt "calm" and

---

[6] A crack cocaine pipe, which Miles testified belonged to C.H., was found on a desk near the cottage's front door. The police lieutenant testified that Miles did not appear to be intoxicated and was therefore not tested for drugs after being taken into custody.

was not yet scared of Jackson at this point, although he was "[s]omewhat" scared by the notion that Jones was going to "get his boys."

Jackson walked away down the driveway, and Miles went into the bedroom and saw the broken window. He placed a headboard and a shutter door in front of the window. C.H. indicated to him that Jackson must have told Jones where she was. Miles knew Jackson but was not friends with him. According to Miles, Jackson had "c[o]me over threatening [him] about two weeks before" because he thought C.H. was at Miles's house, but Jackson did not follow through on those threats and eventually apologized.

Sometime later, Jackson returned and asked to speak to C.H. Miles, holding the rifle, let him into the cottage.[7] Miles heard C.H. accuse Jackson of telling Jones where she was. Miles then told Jackson he needed to leave, thinking that Jackson and Jones were "on this mission[,] that they were together. [Jones] did not know where [C.H.] was, [but Jackson] . . . told him where she was and brought him there. [Jackson] had dealings with [Jones] before, so he knew what type of guy he was." Jackson left the cottage, and Miles closed and locked the security door.

Miles testified that once Jackson had walked down the porch steps, Jackson "started making his threats about what he was going to do to [Miles]." Jackson said, " 'I'ma be back. Me and my brother, we gonna do something to you. We been here once before. . . . I can get a gun, I can get a gun.' " Miles could not see whether Jackson had a weapon because "[h]e was hiding behind the side of the house talking about what he was going to do." Although Miles did not believe that Jones "was there at that time," he thought Jones was coming back "maybe immediately" because of Jackson's statements that Jones had gone to get "his boys." Jackson also said to Miles, " 'You'll be sorry that you didn't shoot me when I come back.' " Miles denied that he argued with Jackson or

---

[7] The police lieutenant testified that Miles said during their interview that Jackson arrived 15 to 20 minutes after Jones left. When asked why he initially let Jackson inside, Miles told the lieutenant "that he had his rifle, and he wasn't worried about [Jackson]. He was tired of people thinking that they [could] push him around."

10

that he even said anything to Jackson after Jackson exited the cottage.  Miles also denied that he ever "went outside during the whole incident."

Miles closed the wooden front door and unplugged the outside porch light, which was a light bulb hanging from a cord connected to a power strip inside the cottage.  He explained that he unplugged the light because he "was afraid for [himself], [C.H.], and [his] house" and intended to protect them against the threat Jackson posed.  When asked what he was thinking when he turned off the light, he responded, "I just put [Jackson] out in the dark.  'Get out of my yard, get out of my yard.' "

Miles testified that about 15 seconds after last seeing Jackson, he heard a gunshot, glass break again in the bedroom, and C.H. scream.  In the videotaped excerpt of his police interview, however, Miles indicated he "just heard a window break" and could not "remember hearing a loud bang" before the breaking sound.  In his testimony, Miles explained that he felt "scared" for his and C.H.'s lives:  "[Jackson] was talking crazy.  He was making threats about getting a gun.  I do not know what he had on the side of that house there, and . . . he was standing, trying to cover himself in the same way he was standing.  I don't know what he had.  I don't know what he had in his hand."  Miles acknowledged he did not believe Jackson had a gun while the other man was talking about getting one, but he testified that he believed Jackson could have "go[ne] out and come back, 'cause when [Miles] closed the door, [he did not] know what [Jackson] had down the driveway."

Miles picked up the rifle, opened the wooden door, "pointed in the area where . . . [Jackson] was generally last standing at," and "just fired twice in the dark."  Miles testified, "I was afraid for my life, and I thought they had shot at me[,] and I fired."  He estimated that "[n]o more than four or five seconds" passed between the shots.  On cross-examination, he testified that he understood that bullets can kill but "did not aim to really kill anybody, so . . . [¶] . . . I guess you could say it could have been an accident[.]"  He then testified, however, that he "intentionally fired [the] rifle at . . . Jackson" and "was afraid for [his] life" at the time he fired the second shot.  When asked whether it was fair to say he "intentionally killed . . . Jackson so [Jackson] wouldn't kill [him] first," Miles

11

responded, "You could say that's correct." Miles also testified that at the time he fired he did not know where Jones was and "probably" feared Jones.

Miles then plugged the porch light back in, "turned the light on to see if [Jackson] was still out there," and saw the other man lying "face down." He did not hear Jackson say anything after being shot. Miles told C.H. that he thought he had hit Jackson and she could either stay or leave but that he was going to wait for the police to arrive. He testified that he was willing to let her leave because he believed Jones was not outside and the police were on their way. He could not remember, however, whether he actually called the police.

## II.
### DISCUSSION

A.    *Miles's Fifth Amendment Claim Fails Because the Trial Court Correctly Determined that Insufficient Evidence Was Presented Before Miles Testified to Support the Requested Jury Instructions.*

As we have mentioned, the defense initially rested without Miles having testified. At that point, he requested jury instructions on various self-defense-related principles and heat-of-passion voluntary manslaughter. Specifically, he asked for the jury to be instructed on reasonable self-defense and defense of another (CALCRIM No. 505), defense of habitation (CALCRIM No. 506) and the presumption of reasonable fear applicable to that defense (CALCRIM No. 3477), imperfect self-defense and defense of another (CALCRIM No. 571), and heat-of-passion voluntary manslaughter (CALCRIM No. 570).[8] The trial court denied Miles's request for these instructions after finding that insufficient evidence was presented to support them. Miles was allowed to reopen his case, and he then testified. Based on his testimony, the court later gave the requested instructions, with the exception of CALCRIM No. 3477. Miles's argument on appeal is that the court improperly forced him to waive his rights under the Fifth Amendment by

---

[8] After an unreported discussion of the jury instructions, the trial court invited Miles's trial counsel to identify on the record the defense's requested instructions. Although counsel did not mention a heat-of-passion instruction at that time, the court's comments and ruling make clear that it understood such an instruction was requested.

denying his initial request for the instructions. We are not persuaded because we disagree with the premise that substantial evidence supported the request before Miles testified.

In denying the self-defense-related instructions before Miles testified, the trial court stated, "[A]s the evidence stands right now, there is no evidence that [Miles] believed, had an actual belief [in] the need to act in self-defense, or that there was a reasonable basis for that belief, much less that he acted because of that belief and not from any other motive." As to a heat-of-passion instruction, the court found that the "testimony relating to . . . Jackson's conduct" alone was insufficient to establish provocation. In ruling, the court emphasized its view that evidence of Jones's conduct did not support the requested instructions because there was no evidence that Jones was actually present or that Miles believed Jones was present at the time Jackson was shot.

In considering the trial court's ruling, we first review the applicable law. " ' "[A] defendant has a constitutional right to have the jury determine every material issue presented by the evidence[.]" ' [Citation.] 'To protect this right and the broader interest of safeguarding the jury's function of ascertaining the truth, a trial court must instruct on lesser included offenses . . . whenever there is substantial evidence raising a question as to whether all of the elements of the charged offense are present.' [Citation.] Conversely, even on request, a trial judge has no duty to instruct on any lesser offense unless there is substantial evidence to support such instruction." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1007-1008, italics omitted.) Likewise, a trial court need not give a requested instruction on an affirmative defense if there is insufficient evidence to support the instruction. (*People v. Mentch* (2008) 45 Cal.4th 274, 288.)

Evidence is substantial if "a reasonable jury could find [it] persuasive." (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8.) In determining whether there is substantial evidence of a lesser included offense or affirmative defense, courts do not evaluate the credibility of witnesses. (*People v. Mentch*, *supra*, 45 Cal.4th at p. 288; *People v. Breverman* (1998) 19 Cal.4th 142, 162.) We review de novo a trial court's refusal to instruct on a lesser included offense or affirmative defense. (*People v. Waidla* (2000)

13

22 Cal.4th 690, 733.) In doing so, we view the evidence in the light most favorable to the defendant. (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.)

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) A killing committed in reasonable self-defense, defense of another, or defense of habitation is justifiable homicide and not a crime. (§ 197.) These affirmative defenses all have a subjective and objective component: they require that a defendant both actually and reasonably believed in the need to use deadly force to defend against an " 'imminent danger to life or great bodily injury.' " (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082, italics omitted; *People v. Her* (2009) 181 Cal.App.4th 349, 353-354; *People v. Curtis* (1994) 30 Cal.App.4th 1337, 1360.) "Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice." (*In re Christian S.* (1994) 7 Cal.4th 768, 783.) When a person uses deadly force "within his or her residence" against someone who does not live there and who he or she knows or has reason to believe "has unlawfully and forcibly entered the residence," there is a rebuttable presumption that the resident had "a reasonable fear of imminent peril of death or great bodily injury to self, family, or a member of the household." (§ 198.5; *People v. Silvey* (1997) 58 Cal.App.4th 1320, 1326.)

"Imperfect self-defense, which reduces murder to voluntary manslaughter, arises when a defendant acts in the actual but unreasonable belief that he is in imminent danger of death or great bodily injury." (*People v. Duff* (2014) 58 Cal.4th 527, 561.) "The subjective elements of self-defense [or defense of another] and imperfect self-defense [or defense of another] are identical. Under each theory, the appellant must actually believe in the need to defend . . . against imminent peril to life or great bodily injury." (*People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1262; see also *People v. Michaels* (2002) 28 Cal.4th 486, 530.) "Heat of passion, which likewise reduces murder to voluntary manslaughter, arises when the defendant is provoked by acts that would 'render an ordinary person of average disposition "liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment" ' [citation] and kills while under the actual influence of such a passion [citation]." (*Duff*, at p. 562.)

14

In applying the law to the facts here, we begin by agreeing with Miles that evidence of Jones's earlier conduct was relevant in evaluating Miles's mind state when he shot Jackson. In arguing this point, Miles primarily relies on *People v. Minifie* (1996) 13 Cal.4th 1055 (*Minifie*). In that case, our state Supreme Court held that "evidence of third party threats is admissible to support a claim of [reasonable] self-defense if there is also evidence from which the jury may find that the defendant reasonably associated the victim with those threats." (*Id.* at p. 1060.) Similarly, such evidence is admissible to support a claim of imperfect self-defense "if there is evidence the defendant actually, even if unreasonably, associated the victim with [third party] threats." (*Id.* at p. 1069.) The court explained that in determining whether a defendant has acted in self-defense, the focus is on "how the situation appeared to the *defendant*, not the victim," and thus there is no requirement that "the victim adopted the third party threats." (*Id.* at p. 1068, italics in original.) On the other hand, "[t]hird party threats . . . do not alone establish self-defense," and "[t]he victim's behavior is also highly relevant." (*Ibid.*, italics omitted.)

While *Minifie*, *supra*, 13 Cal.4th 1055 did not address heat-of-passion voluntary manslaughter, it supports the conclusion that a third party's actions may be relevant in evaluating whether a defendant acted in a heat of passion. This is because whether a defendant acted in a heat of passion also turns on the defendant's perception of events: the relevant issues are whether the defendant was "under 'the actual influence of a strong passion' " (*People v. Moye* (2009) 47 Cal.4th 537, 550) and whether " 'such a passion . . . would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances.' " (*People v. Steele* (2002) 27 Cal.4th 1230, 1252.) Although the provocation arousing the passion "must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim" (*Moye*, at pp. 549-550), that principle is consistent with *Minifie*'s recognition that a third party's behavior can affect the defendant's perception of the victim's conduct.

We also agree with Miles that, contrary to the trial court's suggestion, a third party is not necessarily required to be in the vicinity before evidence of that party's previous threatening conduct may be considered in evaluating a defendant's use of deadly force

15

against the victim. Nothing in *Minifie*, *supra*, 13 Cal.4th 1055 suggests such a requirement. (See generally *id.* at pp. 1061-1064.) While the close proximity of a third party may strengthen the likelihood that the party's conduct affected the defendant's mind state, proximity is not necessary to show such an effect.

Here, evidence was presented even before Miles testified that he had reason to associate Jackson with Jones's prior behavior, and the Attorney General does not argue otherwise. C.H. testified that Jackson told her he was acting on Jones's behalf and that Miles overheard what Jackson said, permitting the conclusion that Jones's earlier behavior affected Miles's reaction to Jackson. Accordingly, we are willing to assume that Jones's prior conduct was relevant in evaluating both whether Miles killed to defend against an imminent danger of deadly harm and whether he killed in a heat of passion.

But just because the jury would have been entitled to find an association between Jones's prior conduct and Jackson, it does not follow that substantial evidence was presented before Miles testified to support the requested instructions. First, as to the self-defense-related instructions, although *Minifie*, *supra*, 13 Cal.4th 1055 establishes that a third party's conduct can affect the defendant's mind state in responding to the victim, the decision rejects the notion that the third party's conduct can *substitute* for behavior from the victim that the defendant perceives as threatening. (*Id.* at p. 1068.) The relevant question is not whether Miles believed he needed to use deadly force against Jones but whether, in light of Jones's earlier conduct, Miles believed he needed to use deadly force against Jackson.

Miles fails to identify any substantial evidence introduced before his testimony to support a conclusion that he actually believed that Jackson posed an imminent danger of death or great bodily injury to either Miles or C.H. C.H. said Miles was "scared" while *Jones* was there earlier in the night, but she did not provide any other insight into Miles's mind state at the time he killed Jackson. Indeed, she did not discuss Jones's behavior with Miles after Jones broke the window, could not see Miles during his confrontation with Jackson, and did not hear Miles say anything suggesting he was afraid before he shot Jackson. Nor was there anything about the circumstances permitting a reasonable

16

inference that Miles held the requisite belief. Certainly, C.H.'s testimony was evidence that Jackson was aggressively trying to enter the cottage, but there was no evidence that he was armed or had any chance of getting through the security door. His threats to get a gun, overheard by B.R., may have suggested a danger of future deadly harm, but they were not evidence of imminent harm. (See *In re Christian S.*, *supra*, 7 Cal.4th at p. 783.) Miles also makes much of the possibility that Jones was, in fact, present at the time Jackson was shot. Even assuming there was substantial evidence that Jones was outside, however, there was no evidence that Miles believed Jones was outside at the time of the shooting, much less that Miles perceived Jackson to be a deadly threat because of Jones's presence.

Nor did the evidence entitle Miles to a jury instruction on the statutory presumption of reasonable fear applicable to defense of habitation. The presumption applies only to a defendant's use of deadly force against a victim "who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence." (§ 198.5.) In *People v. Brown* (1992) 6 Cal.App.4th 1489, the issue was whether a defendant who shot the victim after the victim forcibly entered the "unenclosed front porch" of the defendant's home was entitled to an instruction under section 198.5. (*Brown*, at pp. 1491-1492.) *Brown* imported the test for whether a "residence" had been entered from case law addressing burglary under section 459, holding that the relevant question is "whether the nature of [the] structure's composition is such that a reasonable person would expect some protection from unauthorized intrusions." (*Brown*, at p. 1496, italics omitted; see *People v. Nible* (1988) 200 Cal.App.3d 838, 843, 845.) Under this test, entry onto an unenclosed front porch did not trigger the statutory presumption, because "[a] reasonable person would not expect protection from unauthorized intrusion onto this kind of porch. Quite the contrary. Social convention dictates that anyone wishing to summon the occupant's presence or gain entry into the home must first enter the porch[, and] . . . [t]he reasonable residential occupant would not react violently to this entry." (*Brown*, at pp. 1497-1498.) Thus, Jackson's mere presence on the porch did not warrant a jury instruction on the section 198.5 presumption.

17

Miles contends that C.H.'s testimony that "Jackson tried to force open [Miles's] front door" constituted substantial evidence to require instruction on the section 198.5 presumption. C.H. testified that after Miles locked the door, Jackson was "throwing things up against the door, trying to open [the] door, . . . shaking at [the] door, banging [on it]." Had Jackson actually been successful in opening the door and extending some part of his body beyond it, we might agree with Miles. (See *People v. Moore* (1994) 31 Cal.App.4th 489, 492-493 [sufficient entry under section 459 where burglary tool "violated the airspace" between screen door and front door]; *People v. Nible*, *supra*, 200 Cal.App.3d at p. 845 ["when a screen [door or window] which forms the outer barrier of a protected structure is penetrated, an entry has been made for purposes of the burglary statute"].) But there was no indication, in either C.H.'s testimony or the other evidence presented, that Jackson ever opened the security door or extended any part of his body past it. Indeed, there is no dispute, based on the bullet holes in that door, that it was closed when Miles fired upon Jackson. There was insufficient evidence to require instruction on the section 198.5 presumption.[9]

Finally, insufficient evidence was presented before Miles testified to require a jury instruction on heat-of-passion voluntary manslaughter. Miles argues that Jones's and Jackson's conduct, in light of Jones's, was sufficiently provocatory that it "render[ed] an ordinary person of average disposition 'liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.'" (*People v. Beltran*, *supra*, 56 Cal.4th at p. 957.) Regardless of whether Jones's and Jackson's conduct might constitute substantial evidence of the objective component of provocation, however, Miles does not identify any evidence presented before he testified to suggest he was *actually* under the influence of such a passion when he shot Jackson. The testimony of C.H. and B.R., the only two witnesses who observed Miles at the time of the killing,

---

[9] Even after Miles testified, the trial court refused to give CALCRIM No. 3477, concluding there was no evidence that Jackson was "either inside [Miles]'s home or . . . in the process of entering [it]" when he was killed. Miles does not challenge this ruling on appeal.

"contained no indication that [Miles's] actions reflected any sign of heat of passion at the time he commenced firing . . . ." (*People v. Manriquez* (2005) 37 Cal.4th 547, 585.) Again, C.H. stated that Miles was "scared" while Jones was outside, but her testimony did not cast light on Miles's feelings at the time he shot Jackson. Indeed, there was no evidence that Miles even raised his voice while Jackson was trying to get inside. Thus, as "[t]here was no showing that [Miles] exhibited anger, fury, or rage," or any other sufficiently passionate emotion, "there was no evidence that [he] 'actually, subjectively kill[ed] under the heat of passion.' " (*Ibid.*) In sum, the trial court properly refused to give the requested instructions after the defense initially rested, and there was therefore no violation of Miles's Fifth Amendment rights because Miles was not improperly forced to testify.

B.    *The Omission of Pinpoint Instructions on the Relevance of Third Party Threats Was Harmless.*

Miles claims the trial court erred by not reading optional portions of CALCRIM Nos. 505 and 571 "that relate the concepts of perfect and imperfect self-defense and defense of another to threats and violent conduct by third . . . parties." We agree but conclude that the error was harmless.

Miles objected to the trial court's proposed version of CALCRIM No. 505, which addresses reasonable self-defense or defense of another, because it did not include an optional paragraph that states, "The defendant's belief that he/she/ [or] someone else was threatened may be reasonable even if (he/she) relied on information that was not true. However, the defendant must actually and reasonably have believed that the information was true." (CALCRIM No. 505.) Miles's trial counsel explained that the relevant "information" was "[t]hat . . . [C.H.] had been beaten, perhaps her house had been burned down," and "there was evidence that [Miles] was made aware of those facts."

Miles also objected that the proposed version of CALCRIM No. 505 did not include the following optional language: "If you find that the defendant received a threat from someone else that (he/she) reasonably associated with [the victim], you may consider that threat in deciding whether the defendant was justified in acting in (self-

19

defense/ [or] defense of another).” (CALCRIM No. 505.) Similarly, he objected to the proposed version of CALCRIM No. 571 because it omitted the following optional language: “If you find that the defendant received a threat from someone else that (he/she) associated with [the victim], you may consider that threat in evaluating the defendant’s beliefs.” (CALCRIM No. 571.)

The trial court declined to include the requested additional language because all of it “relate[d] to . . . Jones.” Addressing Miles’s trial counsel, the court said:

> “I realize that you want . . . to group . . . Jackson and . . . Jones together, but . . . I don’t believe that it is appropriate for me to give instructions that would have a tendency to do that for the jury.
>
> Frankly, I don’t believe that those things as to . . . Jones are particularly relevant to the question of defending one[]self or another person against . . . Jackson. And . . . Jackson is the person who got shot. And . . . there is no evidence whatsoever that anybody but . . . Jackson was outside [Miles’s] home.
>
> I recognize that [Miles] testified that [Jones] could have been there. He also testified that he understood that [Jones] had gone to call his boys and wasn’t there. But there’s no evidence of any sort that [Jones] was there.”

“A ‘criminal defendant is entitled to adequate instructions on the defense theory of the case’ if supported by the law and evidence.” (*People v. Bell* (2009) 179 Cal.App.4th 428, 434.) The three optional portions of the CALCRIM instructions that Miles contends should have been given are pinpoint instructions, which “relate particular facts to a legal issue in the case or ‘pinpoint’ the crux of a defendant’s case.” (*People v. Saille* (1991) 54 Cal.3d 1103, 1119; see also *People v. Garvin* (2003) 110 Cal.App.4th 484, 488-489.) A pinpoint instruction need be given only upon request, and only if “there is evidence supportive of the theory” and “ ‘the proffered instruction . . . is [not] an incorrect statement of law,’ argumentative, duplicative, or confusing.” (*Saille*, at p. 1119; *Bell*, at pp. 434-435.) We review such claims of instructional error de novo. (*People v. Waidla*, *supra*, 22 Cal.4th at p. 733; *People v. Braslaw* (2015) 233 Cal.App.4th 1239, 1244.)

Miles contends the trial court's refusal to give the requested optional portions of CALCRIM Nos. 505 and 571 rested on the mistaken conclusion that "Jones's conduct was not relevant to [Miles's] mental state when he shot Jackson" because "there was no evidence that Jones was nearby" at the time. As we have said, we agree with the general principle that a third party's presence is not required for that party's threatening conduct to be relevant to evaluating the defendant's use of deadly force against the victim.

The Attorney General does not contend otherwise. Nor does she contend that the requested pinpoint instructions were legally incorrect, argumentative, duplicative, or confusing. Instead, she argues that the lack of evidence that Jones was present removed the need to give the instructions because there was no evidence of any imminent threat—whether "to execute Jones's threats" or otherwise—from Jackson.[10] But whether there was sufficient evidence for the jury to conclude that Miles believed Jackson posed an imminent danger of deadly harm was an issue in deciding whether to instruct on self-defense-related principles at all. In evaluating whether to give the pinpoint instructions, in contrast, the trial court needed to decide only whether there was evidence that Miles associated Jackson with Jones's threats and that this association affected Miles's perception of the threat Jackson posed. We agree with Miles that his and C.H.'s testimony provided sufficient such evidence, and the court therefore erred by refusing to give the pinpoint instructions.

We thus turn to whether the error was prejudicial. Miles contends the trial court's refusal to give the pinpoint instructions "infringed upon [his] constitutional right to present a complete defense" and is therefore subject to review under *Chapman v. California* (1967) 386 U.S. 18, which asks whether the error was harmless beyond a reasonable doubt. (*Id.* at p. 24.) We disagree. The trial court gave the standard jury instructions on reasonable and imperfect self-defense and defense of another, and the

---

[10] The Attorney General also argues that the lack of evidence that Jones was present established there was no imminent threat from Jones himself, but whether Miles would have been justified in using deadly force against Jones, who was not the victim, is not at issue.

failure to give a pinpoint instruction on an affirmative defense or lesser included offense is subject to review under the more forgiving standard of *People v. Watson* (1956) 46 Cal.2d 818, which asks whether "it is . . . reasonably probable that had the jury been given [the] defendant's proposed pinpoint instruction, it would have come to any different conclusion[.]" (*People v. Earp* (1999) 20 Cal.4th 826, 886-887; *People v. Wharton* (1991) 53 Cal.3d 522, 571-572.)

We conclude that the error in omitting the pinpoint instructions was harmless under this standard. Evidence of Jones's prior conduct was admitted, and nothing prevented the jury from considering it. Under the versions of CALCRIM Nos. 505 and 571 given, the jury was instructed to "consider all the circumstances as they were known" to and "appeared to" Miles in evaluating his beliefs. And in closing, Miles's trial counsel referred numerous times to Jones and the fact he had "teamed up" with Jackson in arguing that Miles believed there was an imminent danger of deadly harm. Thus, "[i]t is unlikely the jury hearing the evidence, the instructions given[,] and the argument of counsel would have failed to give the defendant's position full consideration." (*People v. Gonzales* (1992) 8 Cal.App.4th 1658, 1665 [holding, on similar grounds, that any error in refusing to give pinpoint instruction on antecedent threats was harmless].)

Miles disagrees, contending that the pinpoint instructions' omission "was likely perceived by the [jurors] 'as narrowing the scope of facts and circumstances which they were entitled to consider to only those perceived by any other "reasonable man," ' who suddenly found himself standing in [Miles's] shoes, without any awareness of highly relevant recent events." (Quoting *People v. Pena* (1984) 151 Cal.App.3d 462, 476.) *Pena* involved a failure to instruct "on the effect of [the defendant's] knowledge of [previous] threats made against [the defendant] by the deceased." (*Id.* at pp. 470-471, 474.) But *Pena* and the two cases on which it relied for its determination that the jury's instruction on general self-defense principles was "insufficient to mitigate the omission" of the pinpoint instruction at issue (*id.* at p. 475, citing *People v. Bush* (1978) 84 Cal.App.3d 294; *People v. Torres* (1949) 94 Cal.App.2d 146) were decided decades

before the CALCRIM instructions were adopted. (See *People v. Thomas* (2007) 150 Cal.App.4th 461, 465.) And there is no indication that the instructions that *were* given in those cases contained language similar to that in the versions of CALCRIM Nos. 505 and 571 given here, which explicitly required the jury to consider what Miles knew and perceived. (See *Pena*, at p. 475; *Bush*, at p. 304; *Torres*, at p. 153.) Moreover, although the trial court's refusal to give the pinpoint instructions may have "enabled" the prosecutor "to entirely focus on the conduct of . . . Jackson and argue that Jackson by himself did not present an imminent threat of harm," nothing about the ruling prevented Miles's trial counsel from arguing, as he in fact did, that the jury should consider Jones's behavior in evaluating Miles's mind state.

We also reject Miles's contention that prejudice is demonstrated because the jury in his first trial received the pinpoint instructions at issue and was unable to reach a verdict. The evidence in the two trials differed in crucial respects, distinguishing this case from others relying on a previous hung jury to find prejudice: at the first trial, C.H. did not testify, Miles did not testify, and Miles's entire interview with the police lieutenant was played for the jury. (Cf., e.g., *People v. Gonzalez* (2006) 38 Cal.4th 932, 962; *People v. Kelley* (1967) 66 Cal.2d 232, 245.) These differences affected the evidence the respective juries heard on the issue of Miles's mind state, and we agree with the Attorney General that it would therefore be speculative for us to rely on the previous hung jury to conclude that the outcome in the second trial was reasonably likely to have been different had the pinpoint instructions been given.

C.     *Miles's Claim of Prosecutorial Misconduct Fails Because It Is Not Reasonably Likely that the Challenged Comments Affected the Verdict.*

Miles claims the prosecutor committed misconduct in closing argument by misstating the law on heat-of-passion voluntary manslaughter. We agree that the prosecutor made confusing statements about the applicable legal standard, but Miles has not demonstrated the prejudice necessary for reversal.

During closing argument, the prosecutor addressed the legal standards governing heat-of-passion voluntary manslaughter. Initially, he stated, "You're going to be asked

23

to consider 'shoot me, shoot me' provocation sufficient such that . . . a reasonable person would act . . . without deliberation. . . . [¶] One thing just to notice about . . . heat of passion [instructions] is . . . [they] deal with the fact of the defendant's state of mind at the time he killed, and . . . deal and depend heavily on the law of a reasonable person standard. He cannot set up his own standard of conduct. You have to look at what a reasonable person in those circumstances, how that person would have reacted."

The prosecutor then said, "No heat of passion, there's no loss of judgment. . . . I mean, [Miles] could have locked the doors, he could have called the police. But, instead, . . . when he saw . . . Jackson, instead he let him in. He could have done the same thing when he started to get into an argument with . . . Jackson. There's no provocation here, slight, if any. Again, does just saying 'shoot me' count as provocation sufficient to justify shooting a man? [¶] Does not leaving the property count as provocation sufficient [to] . . . arouse a reasonable person to act rashly out of passion, instead of using judgment? No, an average person would lock the door, would call the police. Maybe would fire a warning shot, if it really came to that, but I don't think it even gets that far. And what a reasonable person would have done in this situation is less important than knowing that a reasonable person in that situation would have been capable of exercising judgment about what to do. Should I call the police? Should I lock the door? Should I show him that I've got a weapon? Right? That judgment is all intact . . . if a reasonable person were in the defendant's shoes."

A prosecutor's improper comments violate the federal Constitution if they " ' "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." ' " (*People v. Cunningham*, *supra*, 25 Cal.4th at p. 1000.) Even if it does not violate the federal Constitution, a prosecutor's conduct violates " ' "state law . . . if it involves ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " [Citations.]' " (*Ibid.*) When a claim of prosecutorial misconduct "is based upon 'comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. [Citation.]' " (*Id.* at p. 1001.)

24

There is no question that " '[i]t is improper for the prosecutor to misstate the law[.]' " (*People v. Hill* (1998) 17 Cal.4th 800, 829.)

A claim of prosecutorial misconduct involving statements to the jury is generally forfeited unless the defendant both timely objects and " ' " 'request[s] that the jury be admonished to disregard the impropriety.' " ' " (*People v. Cunningham*, *supra*, 25 Cal.4th at p. 1000.) Acknowledging that he failed to object below to the statements he now challenges, Miles argues we should nevertheless exercise our discretion to reach the claim's merits. (See *People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6.) Alternatively, he contends his trial counsel provided ineffective assistance of counsel by failing to object to the prosecutor's argument. We choose to address the merits of the prosecutorial-misconduct claim and therefore do not reach the ineffective-assistance claim. (See *People v. Turner* (1990) 50 Cal.3d 668, 708 [addressing merits of forfeited claim "to forestall claims of ineffective assistance"].)

We agree with Miles that some of the prosecutor's statements ran afoul of *People v. Beltran*, *supra*, 56 Cal.4th 935, which was announced a few months before closing arguments. In that case, our state Supreme Court affirmed that to reduce murder to voluntary manslaughter, provocation must be that which " 'would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment,' " not that which "would cause an ordinary person of average disposition *to kill*." (*Id.* at pp. 938-939, italics in original.) The court explained, "The proper focus is placed on the defendant's state of mind, not on his particular act. To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection." (*Id.* at p. 949, italics in original.) Here, the prosecutor's direction to the jury "to look at what a reasonable person in those circumstances, how that person would have *reacted*" (italics added) was incorrect under *Beltran* because it focused on the actions, not the mind state, of a reasonable person. (See *ibid.*) Similarly, the prosecutor's statements about "what a reasonable person would have done in this situation"—such as "lock the door" or "call

the police"—were improper because they also suggested that the jury should evaluate whether a reasonable person would have acted the way Miles did.

Miles fails to convince us, however, that the prosecutor's improper comments were prejudicial. The comments were interspersed with correct statements about the applicable legal standard, including that the question was whether a reasonable person "would act . . . without deliberation," would "act rashly out of passion, instead of using judgment," or "would have been capable of exercising judgment about what to do." (See *People v. Dennis* (1998) 17 Cal.4th 468, 522 [prosecutor's challenged statements in closing "must [be] view[ed] in the context of the argument as a whole"].) To the extent the jury was confused about the correct standard, it was specifically instructed that it had to follow the law as explained by the trial court, not counsel, and it was properly instructed on that standard under CALCRIM No. 570. Thus, it is unlikely the jury would have credited the prosecutor's suggestions to focus on Miles's actions instead of mind state in determining whether Miles killed in the heat of passion. Moreover, the defense's main theme was that Miles acted in self-defense, and his trial counsel did not even address heat-of-passion voluntary manslaughter in closing argument. We therefore conclude that "there was no reasonable possibility the prosecutor's challenged statements affected the jury's [verdict]." (*People v. McDowell* (2012) 54 Cal.4th 395, 438.)

### D. *Miles Is Not Entitled to Relief on the Basis of Cumulative Error.*

Miles contends the cumulative effect of the errors he identifies requires reversal of his conviction, even if the errors do not individually require reversal. The only error we have identified is the trial court's refusal to give pinpoint instructions related to reasonable and imperfect self-defense and defense of another, which does not justify reversal as we have explained above. And to the extent the prosecutor's comments on heat-of-passion voluntary manslaughter were misleading, they were not prejudicial on their own and did not compound any harm from the omission of the pinpoint instructions, which addressed unrelated concepts. Therefore, we reject Miles's claim that cumulative error rendered his trial unfair.

*E.     The Abstract of Judgment Requires Correction.*

Finally, Miles argues that the abstract of judgment must be corrected to reflect that the sentencing enhancement for personal discharge of a firearm causing death was imposed under section 12022.53, subdivision (d), not section 12022.5, subdivision (d). We agree.

The information alleged that Miles personally and intentionally discharged a firearm causing death under section 12022.53, subdivision (d), and the jury found that Miles "did personally and intentionally discharge a firearm and cause death to . . . Jackson in the commission of the . . . offense." The abstract of judgment, however, reflects the trial court's misstatement during sentencing that the enhancement was found true under section 12022.5, subdivision (d), a statute that involves shooting firearms from vehicles and is therefore inapplicable.

"It is well established that a sentence which is the result of clerical error (in the sense of inadvertence, [even if] committed by the judge) may be corrected at any time, by the trial court or the reviewing court; the same is true of an unauthorized sentence, such as one which fails to apply mandatory law." (*People v. Menius* (1994) 25 Cal.App.4th 1290, 1294-1295.) It is apparent the trial court intended to impose the personal-discharge sentencing enhancement under section 12022.53, subdivision (d), and we therefore accept the Attorney General's concession that the abstract of judgment must be corrected to refer to that statute.

## III.
### DISPOSITION

The judgment is affirmed. The abstract of judgment is ordered modified to specify that the term of 25 years to life was imposed for a sentencing enhancement under section 12022.53, subdivision (d), not section 12022.5, subdivision (d). The clerk of the superior court is ordered to forward a copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.

27

_____

Humes, P.J.

We concur:


_____

Margulies, J.


_____

Banke, J.


*People v. Miles* (A140226)

28